1 | Kerry McInerney Freeman (SBN 184764)
    kmf@millerlawgroup.com
2 | Claudia J. Castillo (SBN 215603)
    cjc@millerlawgroup.com
3 | MILLER LAW GROUP
    A Professional Corporation
4 | 111 Sutter Street, Suite 700
    San Francisco, CA 94104
5 | Tel. (415) 464-4300
    Fax (415) 464-4336
6 |
    Attorneys for Plaintiff
7 | REEVES & ASSOCIATES, PLC

**SEALED BY COURT ORDER**

**WHA**

FILED
2011 SE. 23 P 3: 55
RICHARD W. WIEKING

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REEVES & ASSOCIATES, PLC, **CV**<br><br>    Plaintiff(s),<br><br>v.<br><br>MATTHEW D. MULLER, AND DOES 1-2 INCLUSIVE,<br><br>    Defendant(s). | Case No.: **11 4762**<br><br>**TO BE FILED UNDER SEAL WITHOUT AN ENTRY IN THE COURT'S ELECTRONIC FILING SYSTEM**<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE**<br><br>Complaint filed: |

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
SAN FRANCISCO, CALIFORNIA

9

# TABLE OF CONTENTS

I.   INTRODUCTION ......................................................................................................... 1

II.  FACTUAL BACKGROUND........................................................................................... 2

A.   R&A Has Invested Significant Time And Money In The Development Of Its Trade Secrets And Other Confidential And Proprietary Information And Takes Reasonable Steps To Maintain Secrecy .............................................. 2

B.   Defendant Understood And Agreed That R&A's Data Belonged To The Firm And Should Be Returned Upon The Termination Of His Employment............. 5

C.   Despite His Awareness That He Was Exceeding His Authorized Access, Defendant Accessed And Copied Thousands Of Confidential Computer Files, And Then Deliberately Destroyed Evidence Of His Nefarious Activities......................................................................................................... 7

III. LEGAL ARGUMENT................................................................................................... 12

A.   Legal Standard For TROs Without Notice To Defendant................................. 12

B.   R&A Is Likely To Prevail On The Merits Of Its Claims ..................................... 13

1.   Defendant Has Misappropriated R&A's Trade Secrets .......................... 14

2.   Defendant Violated The CFAA ................................................................ 15

3.   R&A Is Likely To Prevail On Its Breach Of Contract Claim .................... 18

C.   R&A Will Suffer Irreparable Harm If An Immediate TRO Is Not Granted ......... 18

D.   The Balance Of Hardships Strongly Favors R&A............................................. 19

E.   Defendant Should Be Prohibited From Destroying Any Evidence In Electronic Form And Required To Allow R&A's Expert To Copy All R&A Related Electronic Files In Their Possession.................................................... 20

F.   R&A Is Entitled To Immediate Discovery Of Highly Relevant Evidence........... 22

G.   Giving Notice To Defendant Before Filing This Motion Would Defeat The Preservation Of Evidence Held By Parties With A History of Destroying Evidence .......................................................................................................... 23

IV.  CONCLUSION............................................................................................................ 24

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
SAN FRANCISCO, CALIFORNIA

i

**Cases**

*ABBA Rubber Co. v. Seaquist*
235 Cal. App. 3d 1 (1991)................................................................. 14

*AdvantaCare Health Partners, LP v. Access IV*
No. 03-04496, 2004 WL 1837997 (N.D. Cal. Aug. 17, 2004).......................... 20

*AT&T Commc'ns. of Cal. v. Pac. Bell*
No. 96-1691, 1996 WL 940836 (N.D. Cal. July 3, 1996)................................ 18

*Cal. Indep. Sys. Operator Corp. v. Reliant Energy Servs, Inc..*
181 F. Supp. 2d 1111 (E.D. Cal. 2001)................................................. 12

*Cargill Inc. v. Progressive Dairy Solutions*
No. 07-407 (E.D. Cal. Mar. 2, 2007) ..............................................13, 20

*Caribbean Marine Servs. Co. v. Baldridge*
844 F.2d 668 (9th Cir. 1988)............................................................ 12

*Courtesy Temporary Service, Inc. v. Camacho*
222 Cal. App 3d 1278 (1990)........................................................... 15

*Dodge, Warren & Peters Ins. Servs., Inc. v. Riley*
105 Cal. App. 4th 1414 (2003)......................................................... 20

*Gallagher Benefit Servs. v. De La Torre*
283 Fed. Appx. 543 (9th Cir. 2008).................................................... 18

*Int'l Airport Ctrs., L.L.C. v. Citrin*
440 F.3d 418 (7th Cir. 2006)........................................................... 16

*Lillge v. Verity*
2007 WL 2900568 (N.D. Cal. Oct. 2, 2007) ......................................13, 19

*Morlife, Inc. v. Perry*
56 Cal. App. 4th 1514 (1997)........................................................... 19

*Multiven, Inc. v. Cisco Sys., Inc.*
725 F. Supp. 2d 887 (N.D. Cal. July 20, 2010) ....................................... 16

*Pacific Aerospace & Electronics, Inc. v. Taylor*
295 F. Supp. 2d 1188 (E.D. Wash. June 20, 2003) .................................. 17

*Pod-Ners LLC v. Northern Feed & Bean of Lucerne Ltd. Liability Co.*
204 F.R.D. 675 (D. Colo. 2002)........................................................ 22

*Qwest Communications Int'l, Inc. v. WorldQuest Networks, Inc.*
213 F.R.D. 418 (D. Colo. 2003) ........................................................ 22

*ReadyLink Healthcare v. Cotton*
126 Cal. App. 4th 1006 (2005).......................................................14, 19

*Reeves v. Hanlon*
3 Cal. 4th 1140 (2004) .................................................................... 4

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
SAN FRANCISCO, CALIFORNIA

*Semitool, Inc. v. Tokyo Electron America, Inc.*
208 F.R.D. 273 (N.D. Cal. 2002)...................................................................................22, 23

*Stuhlbarg Int 'l Sales Co. v. John D. Brush & Co.*
240 F. 3d 832 (9th Cir. 2001)................................................................................... 12

*SuccessFactors, Inc.* v. *Sofiscape, Inc.*
544 F. Supp. 2d 975 (N.D. Cal. 2008) .......................................................................13, 17

*U.S. v. Nosal*
642 F.3d 781 (9th Cir. 2011)....................................................................................15, 16

*ViCHIP Corp. v. Tsu-Chang Lee*
438 F. Supp. 2d 1087 (N.D. Cal. 2006) .....................................................................16, 17

**Statutes**

18 U.S.C. § 1030(a)(5)(A-B)................................................................................... 16

Cal. Civ. Code § 3426 ...........................................................................................14, 18

Cal. Civ. Code § 3426.1(b).................................................................................... 14

California Penal Code § 502 ................................................................................... 16

Fed. R. Civ. P. 65(b).............................................................................................. 12

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
SAN FRANCISCO, CALIFORNIA

# I. INTRODUCTION

This is a case in which an attorney boldly, and in stealth mode

◘ rummaged through the files of his law firm's computer network on the weekend and in the middle of the night in his final days before resigning;

◘ accessed confidential files he had no business accessing regarding other employees, and clients for whom he had never performed any work;

◘ copied the firm's Brief Bank, client lists, confidential price lists, treatises and other confidential, proprietary, copyrighted, and privileged information; and, as his final act before resigning in the early morning hours of September 15, 2011;

◘ tried to cover his tracks by using an application called "Eraser" to erase any sign of the aforementioned conduct.

Plaintiff Reeves & Associates ("R&A" or "the Firm"), is an immigration law firm founded 31 years ago by the Founding and Managing Partner Robert L. Reeves. Mr. Reeves has overseen the growth of the firm from a one-employee, one-office firm to a high volume, high quality practice with approximately 65 employees and four offices (three in the United States and one in the Philippines). The Firm's growth results from its significant investment of time and money in pursuing marketing endeavors, developing competitive pricing contracts, providing their attorney's valuable practice and training resources (such as Brief Banks, treatises, and continuing education materials), and delivering efficient, quality representation over the past 31 years to create a healthy source of repeat clients and referrals from satisfied clients.

Matthew D. Muller ("Defendant") worked as a lawyer for R&A for less than five months, and, after professing that he "might co-opt" the Firm, decided to take what he wanted and run, mistakenly thinking that the Eraser application would render his theft of wide-ranging trade secrets and other confidential and proprietary data and materials undetectable. R&A

1  hereby seeks a temporary restraining order to stop the unlawful use of its trade secrets,
2  prevent the further destruction of evidence and allow for immediate discovery to secure
3  electronic evidence and uncover the scope of the misappropriation and other improper acts.

## II.  FACTUAL BACKGROUND

**A.  R&A Has Invested Significant Time And Money In The Development Of Its Trade Secrets And Other Confidential And Proprietary Information And Takes Reasonable Steps To Maintain Secrecy**

Under the management of its Founding Partner, Robert L. Reeves, R&A has grown from a one-employee, one-office firm to a high volume, high quality practice with over 50 employees and four offices:  the main office in Pasadena, as well as San Francisco, Las Vegas and Manila, Philippines.  See the Declaration of Robert L. Reeves In Support of Plaintiff's Ex Parte Motion for Temporary Restraining Order ("Reeves Dec."), ¶ 4.  The Firm's growth is a result of having invested significant effort and several millions of dollars in the following:

- ▫ Cultivating a client list that, between repeat clients and client referrals results in nearly half of the Firm's business;  Reeves Dec. ¶ 6
- ▫ advertising, which account for approximately 36% of R&A's business Reeves Dec. ¶ 5; and
- ▫ developing its website presence, which accounts for approximately 12.8% of R&A's business; Reeves Dec. ¶ 5

Given that such a significant portion of R&A's business is derived from repeat clients and client referrals, the Firm places a premium in making sure that its lawyers have the resources to provide quality service.  R&A understands that another critical ingredient for delivering a high volume of quality service is to provide its attorney's the legal resources

1 necessary to support efficient, quality service. For example, the Firm has created a "Brief
2 Bank" – a collection of briefs from throughout the Firm's existence, prepared by R&A
3 attorneys from all of the Firm's offices on various immigration topics. The Brief Bank consists
4 of documents that are not generally part of the public domain. Most of R&A briefs and other
5 documents contained in the Brief Bank are filed with the United States Immigration Offices,
6 Courts and Appellate Boards. These documents are not accessible by the public. R&A's Brief
7 Bank is an invaluable resource to R&A attorneys, allowing them to tap into the knowledge of
8 their colleagues and the experiences of the Firm, and provide quality representation more
9 quickly and efficiently. (Reeves Dec. ¶ 11.)

10

11 Likewise, the Firm has assembled and modified various "Checklists" – a
12 collection of forms available on governmental websites that R&A has devoted time and effort
13 to modifying to better and more efficiently serve the specific needs of R&A's clients. These
14 checklists are another resource that helps the Firm's attorneys and paralegals better and
15 more efficiently serve the Firm's clients. (Reeves Dec. ¶ 11.)

16

17 The Firm has also made a significant investment in purchasing immigration law
18 treatises and continuing education resources for use by the Firm's attorneys and paralegals to
19 stay abreast of the latest developments in immigration law. This includes purchasing
20 materials from the annual American Immigration Lawyers Association continuing education
21 conference. This also includes a recent purchase made for the attorneys, at the request of
22 Defendant, of an expensive multi-volume treatise regarding Defending Immigrants in the Ninth
23 Circuit. (Reeves Dec. ¶ 12.)

24

25 And because the Firm's clientele generally consists of low-income individuals,
26 R&A has invested a lot of resources developing confidential competitive pricing contracts.
27 Due to the nature of the immigration business, it makes more sense for the client and the Firm
28 to enter competitively priced fixed fee retainer agreements, as opposed to hourly

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
SAN FRANCISCO, CALIFORNIA

arrangements. To that end, the Firm's partners invest a considerable amount of time and effort modifying the Firm's fee agreements to ensure that its prices remain competitive despite changing business circumstances. These adjustments, which are reflected in contract templates that are created by the partners and marked "CONFIDENTIAL," come as the result of market research and analysis by R&A employees – they are not the product of random formulas or guesswork. (Reeves Dec. ¶ 10.)

Having worked so hard for so long to build the Firm's client base and make sure the Firm's practice remains an affordable option for its immigrant client base, the Firm has gone to great lengths to protect its confidential, proprietary data, including spending a considerable amount of money and effort trying to establish a secure computer network (both from intruders from outside the Firm and from misappropriation of Firm data and property by current and former employees), and maintaining and disseminating Company policies designed to protect the Firm's data. (Reeves Dec. ¶ 13.)

Moreover, in the past when employees unlawfully co-opted the Firm's valuable resources, the Firm has defended their proprietary and trade secret rights through litigation. Indeed, in 2004, the California Supreme Court upheld a lower court's ruling that two R&A attorneys who accessed R&A's computer database to print out confidential name, address, and phone number information on 2,200 clients had misappropriated R&A's confidential client list violated the Uniform Trade Secrets Act. *Reeves v. Hanlon*, 33 Cal. 4th 1140, 1146, 1155-56 (2004). (Reeves Dec. ¶ 13.)

R&A's trade secrets and other confidential and proprietary information have tremendous economic value to R&A that R&A derives from their secrecy, in that competitors and other third parties could readily use the information to their commercial advantage. For example, competitors could use this information to their advantage (1) to provide competitive services to R&A clients and to interfere with client relationships; and (2) by pricing competitive

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
SAN FRANCISCO, CALIFORNIA

1 services along the lines offered by R&A and/or to underbid R&A for such competing services.
2 This disclosure and use of R&A's trade secrets and other confidential and proprietary
3 information would provide a distinct advantage to anyone competing against R&A, and if
4 disclosed to competitors, the disclosure and use would cause significant damage to R&A's
5 business.

7 Disclosure of R&A's trade secrets and other confidential and proprietary
8 information to competitors of R&A would deprive R&A of the benefits of the considerable time,
9 energy, financial and other resources, it expended to develop them, would give a competitive
10 advantage to R&A 's competitors and would, among other things, negatively impact R&A 's
11 business.

13 **B. Defendant Understood And Agreed That R&A's Data Belonged To The Firm
And Should Be Returned Upon The Termination Of His Employment**

15 R&A hired Defendant on March 29, 2011, before he became licensed to practice
16 law. At that time, Defendant represented that he graduated from law school in 2006 and
17 passed the California Bar Exam in 2007, but that he had delayed submitting his Moral
18 Character Application for one reason or another, and, having finally done so, he was awaiting
19 final approval from the Bar. The Firm agreed to hire Defendant with the expectation that he
20 would be receiving his license imminently. Defendant was finally admitted on May 7, 2011.
21 Although his license took longer than anticipated to come through, the Firm paid him an
22 attorney's salary from the date of hire. (Reeves Dec. ¶ 14.)

24 At the time of his hire, Defendant acknowledged receipt of the Firm's Handbook,
25 indicating that he understood that it was his responsibility to comply with the policies
26 contained therein, including policies regarding confidentiality, privacy protocol, use and
27 maintenance of equipment, computer and email usage, employee conduct and work rules,
28 and the return of Firm property upon termination of employment. (See the Declaration of

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
SAN FRANCISCO, CALIFORNIA

1  Nancy E. Miller In Support of Plaintiff's Ex Parte Motion for Temporary Restraining Order

2  "Miller Dec.", ¶ 4.)

3

4     Critically, R&A's "Confidentiality" policy requires R&A employees to keep client

5  information in the strictest confidence:

6

7     [T]he client's right to privacy is a vital part of legal ethics. It is extremely

8     important that client information is held in the strictest confidence unless there is
   a 'professional need to know' in order to carry out job responsibilities . . . The

9     business and legal information that the employee may acquire during the day's
   work must stay within the confines of the [Firm]. The employee has a legal

10    responsibility not to reveal information about the [Firm's] clients . . .
   Unauthorized release of confidential information may be cause for termination of

11    employment.

12 (Miller Dec. ¶ 4, Ex. A.)

13

14    R&A's Use and Maintenance of Equipment warns employees that the "improper"

15 or "destructive" use of equipment can result in the termination of employment.  R&A's

16 Computer Usage and E-mail Policy notifies R&A employees that:

17

18    "Computers, computer files, the e-mail system, and software furnished to
   employees are [Firm] property intended for business use only.  Employees

19    should not use a password, access a file, or retrieve any stored communication
   without authorization. To ensure compliance with this policy, computer and e-

20    mail usage will be monitored…Personal use of [Firm] computers and networks
   for … high bandwidth activities is forbidden at all times … Employee use of the

21    internet will be monitored and reviewed periodically by [R&A] management.
   Abuses of the privilege of personal internet use will result in disciplinary action…

22    Email may not be used to solicit others for commercial ventures … or other non-
   [Firm] related matters"

23

24 *Id.*

25    The Employee Conduct and Work Rules identified the following prohibited

26 conduct:  "[t]heft or inappropriate removal or possession of Firm property"; "[u]nauthorized use

27 of … computers, or other employer-owned equipment"; "[u]nauthorized disclosure of business

28 'secrets' or confidential information"; "[b]reach of confidentiality, including discussing,

1  removing or releasing any information concerning the PLC clients or any other proprietary
2  information"; and "[u]nauthorized use of computer access codes, passwords and software."

3

4  Finally, R&A's "Return of Property" policy requires that on the last day of
5  employment, employees must return "all corporate property in their possession," including
6  books, training tapes, research materials, [the] employee handbook, [and] laptop computers."
7  Miller Dec. ¶ 4, Ex. A.

8

9  Defendant understood full well that the electronic data he acquired while he was
10  an employee of R&A was R&A property, and that upon termination of his employment he was
11  obligated to return, or otherwise ensure that he was not retaining any data acquired from the
12  Firm during his employment.  Indeed, on April 25, 2011, in the context of discussing whether
13  he would use his personal laptop as his primary Firm computer, Defendant expressly
14  acknowledged that all Firm data that was on his laptop would belong to the Firm and that all
15  Firm data should be removed from the laptop upon termination of his employment:

16  > Also, the computer will be mine but *I understand that the data*
    *belongs to the [Firm]*.  I can sign anything necessary to formalize
17  > that if you like.  If absolutely necessary I can sign over the actual
    > hard drive to the PLC, but I would prefer something stating that
18  > *should I ever leave* (not planning on it), I am required to submit the
    > laptop to the IT department for archiving and wiping of the hard
19  > drive, and that *I will receive all hardware back once the relevant*
    *firm property (data on the hard drive) has been retrieved*.
20

21  (See the Declaration of Shadouh Lopez In Support of Plaintiff's Ex Parte Motion
    for Temporary Restraining Order ("Lopez Decl.") ¶ 15, Ex. A.)
22

23
24  **C.  Despite His Awareness That He Was Exceeding His Authorized Access,**
    **Defendant Accessed And Copied Thousands Of Confidential Computer Files,**
    **And Then Deliberately Destroyed Evidence Of His Nefarious Activities.**
25

26  Despite professing to understand the boundaries between Firm data and his
27  personal data, Defendant went to great lengths to secretly blur the lines between his work and
28

7

1  personal computer usage, often to the dismay of the Firm's computer administrators and
2  management. For example, during his short tenure at the Firm, Defendant was repeatedly
3  counseled to reduce his use of his personal Gmail account during work hours (Lopez Decl.
4  ¶¶ 29, 30); when Defendant defended his extensive use of his Gmail by claiming that he used
5  it for work-related purposes the Firm counseled him that to preserve the integrity of his work-
6  related communications he needed to use the Firm's Outlook email (Lopez Decl. ¶¶ 23, 26 &
7  33, Ex. C); likewise, when Defendant insisted on performing his work on his own laptop or his
8  desktop's local drive, he had to be repeatedly reminded to save all client work onto the Firm
9  computer network to preserve the integrity of his work and so his work would be accessible to
10  the Firm (not just him) (Lopez Decl. ¶¶ 16, 19, Ex. C).

12          Meanwhile, it was when R&A sought to confirm Defendant's representation that
13  he was using his personal Gmail for work-related communications (rather than in engaging in
14  an inordinate amount of personal, non-work-related communications as they had expected)
15  that R&A received what appeared to be a disturbing insight into what might have been
16  Defendant's true motivation for blending his personal and work computer activities – his
17  intention to co-opt the Firm's resources and clients and start up his own competing firm.
18  Specifically, while reviewing a handful of screenshots, R&A's computer administrator noticed
19  two partial Gmail messages that she found quite troubling:

21          ▫    A message in which Defendant wrote, "I'm an associate at a for-profit firm
22               now, but it's basically *only until I learn the business model and*
                 *management well enough to launch my own firm* that will be a sort of
23               private practice/impact litigation/legal services hybrid."

24          ▫    A second message in which Defendant wrote: "I'm working at a small firm
                 (well, pretty largish as immigration firms go, but we're a satellite office),
25               mostly *I'm just learning the industry before I start my own firm (or*
                 *might co-opt this one*, haven't decided).

27  (Lopez Decl. ¶ 33.)

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
SAN FRANCISCO, CALIFORNIA

1           In addition to counseling Defendant regarding his computer usage and other

2  work-related matters, the Firm also believed that Defendant had been sleeping overnight in

3  the office, and asked him to stop. When the Firm tried to address the issue with Defendant,

4  he was circumspect – he would neither confirm nor deny whether he had done so. Indeed, at

5  the end of August and the beginning of September, after Defendant seemed to have been

6  captured on the Firm's security surveillance tape late at night preparing to go to sleep in the

7  office, one of the Firm's partners tried to engage in a dialogue with Defendant to resolve the

8  Firm's concerns. However, even when the two met in person to discuss the issue, Defendant

9  *still* refused to answer the most basic question.

10

11           Perhaps fearing he was about to be terminated for refusing to respond to the

12  Firm's legitimate inquiries about sleeping overnight in the office, Defendant embarked on an

13  unauthorized search through the Firm's computer network starting on the weekend of

14  September 10 and 11, 2011, and continuing into the workweek, accessing thousands of files

15  he had no business need to access, many of which contained a vast array of R&A proprietary,

16  confidential, commercially sensitive, and trade secret information. Even more alarming, data

17  generated by the Firm's computer monitoring software ("Spectorsoft") revealed that Defendant

18  had also copied thousands of files: (i) into the local drive of his R&A-issued computer using a

19  program called the "Local Network Mirror" and (ii) then on to a DataTraveler flash drive.

20  (Lopez Decl. ¶ 39.)

21

22           The data revealed that Defendant accessed the following Firm folders between

23  September 10 and 15:

24          1.     Password protected computer software information, including confidential
                  passwords;

25

26          2.     Several R&A Administrative files containing R&A confidential information
                  about, among other things, Firm policies and procedures, disciplinary
                  issues regarding other current and former employees, Front Desk and

27                  Office Procedures, R&A's Employee Handbook, attorney-client privileged
                  communications between R&A and R&A's attorneys regarding a

28                  confidential personnel issue, advertising budgets and competitor
                  information.

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
SAN FRANCISCO, CALIFORNIA

3.    Training guides and other publications purchased by R&A for the use of R&A attorneys;

4.    The Firm's "Network List" (essentially a "map" of all of R&A's individual computers, including the name of each person assigned to a particular computer.)

5.    "Archive Files" containing sensitive and private prior client information such as client names, addresses, telephone numbers, passport numbers, Alien Card numbers and detailed case information; and

6.    "Network/Tech" files containing all of Mr. Reeves' archived emails for the calendar year 2005, 2009 and 2010, including attorney client privileged communications between Mr. Reeves (on behalf of R&A) and R&A's clients as well as between R&A and R&A's attorneys.

(Lopez Decl. ¶ 40.)

A review of Defendant's Network activities also revealed that Defendant attempted to access, but was denied, access to the following folders:

1.    A folder containing all client files for all of R&A's offices;

2.    A folder containing all Employee Documents (including Personnel/Human Resources related Documents) for all of R&A's offices; and

3.    A folder containing the Accounting Data for all of R&A's offices.

(Lopez Decl. ¶ 41.)

The data also revealed that on September 11, 2011, Defendant created a new folder on his R&A-issued computer's desktop titled "New Folder." Defendant then first transferred documents from the following folders onto the "New Folder" on his R&A-issued desktop computer and then copied files from these folders onto another external, removable device, such as his personal laptop computer or a DataTraveler flash drive:

1.    Spectorsoft Internet Usage Reports for all of R&A's offices. Specifically, Defendant copied the Internet Usage Reports of *at least three prior San Francisco staff members*;

2.    R&A's Brief Bank;

3.    Training guides and other publications purchased by R&A for the use of R&A attorneys;

10

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
SAN FRANCISCO, CALIFORNIA

1

2

3

4. R&A's Confidential Contract Templates (which contained detailed pricing data and were marked "confidential");

5. Firm-enhanced checklists regarding best practices;

6. R&A's Las Vegas' General Folder - containing all accounting files, client briefs, business letters, court filing samples, employment forms and client documents (with private information including passport documents and numbers and other identifying information);

7. R&A's San Francisco's General Folder – containing all accounting files, client briefs, business letters, court filing samples, employment forms and client documents (again, with private information including passport documents and numbers and other identifying information);

8. Robert Reeves' archived emails for the calendar years 2005, 2009 and 2010, including attorney client privileged communications between Mr. Reeves (on behalf of R&A) and R&A's clients as well as between R&A and R&A's attorneys; and

9. The Firm's computer administrator's email archive for R&A's Office Depot receipts, INSZoom Alerts (which contain client matter information) and Paypal receipts for client payments (which include client names, case numbers, email addresses and home addresses).

(Lopez Decl. ¶ 42.)

Along with the aforementioned unauthorized computer activity, between the hours of 2 a.m. and 4 a.m. on September 15, just a couple or so hours before he resigned without any advance warning, Defendant installed a program aptly called "Eraser" on his work computer to wipe his company-issued computer clean of evidence regarding his computer activities. (Lopez Decl. ¶ 49.) (Notably, Defendant neglected to delete the Eraser program from his computer.) Whereas in April 2011, Defendant wrote that he understood he would not be entitled to retain the Firm's data after his employment ended, on the eve of resigning in September 2011 he chose to take whatever he could get a hold of and run, and then cover up his tracks so his actions would be untraceable. When the Firm alerted Defendant that it was aware of all the data he had taken, he responded with a sly denial. And when the Firm, in an effort to resolve this matter without Court intervention, asked Defendant to immediately turn his computer and other devices containing R&A's electronic property over to an independent third party pending resolution to the parties apparent disagreement about what he was

11

1 | entitled to take with him when he left the Firm, he balked.

2

3

4 | These, and many other factors, indicate that R&A cannot rely on Defendant to

5 | do the right thing with regard to R&A's trade secrets and other confidential, proprietary data –

6 | rather, R&A must obtain an Order restraining Defendant from keeping and using that data.

7 | Miller Dec. ¶¶ 8, 9, 11.

8

9 | ### III. LEGAL ARGUMENT

10 | **A.    Legal Standard For TROs Without Notice To Defendant**

11

12 | A temporary restraining order is appropriate where the moving party

13 | demonstrates that, absent the order, it will suffer "immediate and irreparable injury, loss, or

14 | damage." Fed. R. Civ. P. 65(b). The standard for issuing a temporary restraining order is the

15 | same as the standard for granting a preliminary injunction. *See Cal. Indep. Sys. Operator*

16 | *Corp. v. Reliant Energy Servs., Inc.*, 181 F. Supp. 2d 1111, 1126 (E.D. Cal. 2001).  A party is

17 | entitled to a TRO upon showing either (1) probable success on the merits combined with the

18 | possibility of irreparable injury or (2) that the moving party has raised serious questions going

19 | to the merits, and that the balance of hardships tips sharply in the moving party's favor.

20 | *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F. 3d 832, 839-40 (9th Cir. 2001). These

21 | are not separate tests but "the outer reaches of a single continuum." *Id.*   Courts will also

22 | consider the public interest when evaluating a request for injunctive relief.  *Caribbean Marine*

23 | *Servs. Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988).

24

25 | A TRO may be granted without notice to the opposing party if: "(A) specific facts

26 | in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss,

27 | or damage will result to the movant before the adverse party can be heard in opposition; and

28 | (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
SAN FRANCISCO, CALIFORNIA

1  why it should not be required." Fed. R. Civ. P. 65(b)(1)  Based on the facts described above,
2  R&A has shown ample evidence to establish that it will suffer immediate and irreparable injury
3  in the absence of a TRO, and that notice to Defendant should not be required because
4  electronic information can easily be deleted, Defendant actively has tried to hide his activities
5  and has destroyed significant electronic evidence. See *Lillge v. Verity*, 2007 WL 2900568, at
6  *3 (N.D. Cal. Oct. 2, 2007) (discussing court's grant of Plaintiff's ex parte application to
7  "maintain the status quo"); *see also Cargill Inc. v. Progressive Dairy Solutions* No. 07-407
8  (E.D. Cal. Mar. 2, 2007) (unpublished order granting *ex parte* motion for a temporary
9  restraining order preventing destruction of evidence and requiring imaging of electronic
10  media) (attached to Freeman Decl. as Ex. A); *KLA-Tencor Corp. v. Murphy*, Case No. 5:09-
11  CV-01922-RMW (N.D. Cal. May 4, 2009) (unpublished order (granting the plaintiff's *ex parte*
12  motion for a temporary restraining order preventing destruction of evidence and requiring
13  access to electronic media by Computer Investigator) (attached to Freeman Decl. as Ex. B).
14
15  **B.    R&A Is Likely To Prevail On The Merits Of Its Claims**
16
17         Because the possibility of irreparable harm is so great, the burden on R&A to
18  prove likelihood of success is correspondingly lower. *See SuccessFactors, Inc.* v. *Sofiscape,*
19  *Inc.,* 544 F. Supp. 2d 975, 979 (N.D. Cal. 2008) ("the required degree of irreparable harm
20  increases as the probability of success decreases ..., and vice versa") (internal citation
21  omitted). Regardless of the burden, however, R&A is likely to succeed on the merits of the
22  causes of action in its complaint given the conduct uncovered to date. In the interest of
23  efficiency and brevity, R&A discusses only its trade secret, Computer Fraud and Abuse Act
24  and contract breach claims below.[1]
25
26
27  [1] In its Complaint, filed concurrently with this *ex parte* motion, R&A also alleges claims for
28  violation of the Electronic Communications Privacy Act, and various common law causes of
    action.

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
SAN FRANCISCO, CALIFORNIA

MEMORANDUM IN SUPPORT OF PLAINTIFF'S *EX PARTE* MOTION FOR TRO
Case No.:

## 1. Defendant Has Misappropriated R&A's Trade Secrets

The evidence demonstrates that R&A will likely prevail on its trade secret misappropriation claim. The Uniform Trade Secrets Act, as adopted by California, makes actionable any misappropriation of a trade secret. Cal. Civ. Code §§ 3426.1(b), 3426.2 and 3426.3. A "trade secret'" under the Act consists of (1) information (2) which is valuable because it is unknown to others and (3) which the owner has attempted to keep secret. *ABBA Rubber Co. v. Seaquist*, 235 Cal. App. 3d 1, 18 (1991); Cal. Civ. Code § 3426.1(d). "Misappropriation" means acquisition of a trade secret by someone who knows or has reason to know that the trade secret was acquired by improper means or use of a trade secret without consent and with knowledge that the secrets have been improperly acquired. Cal. Civ. Code § 3426.1 (b).[2]

R&A's confidential and proprietary documents and information regarding the law practice that has evolved over the past 31 years -- its brief bank, client lists, confidential client contracts, Firm manuals and best practice checklists, are clearly valuable because they are not known to R&A's competitors and others who could take advantage of them. *See, e.g., ReadyLink Healthcare v. Cotton,* 126 Cal. App. 4th 1006, 1019 (2005) ("customer list and related proprietary information satisfy the first prong of the definition of 'trade secret' under section 3426.1.") (quoting *Courtesy Temporary Service, Inc. v. Camacho,* 222 Cal. App 3d

---

[2] 3426.1(b) defines "misappropriation" as follows: "(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) Disclosure or use of a trade secret of another without express or implied consent by a person who: (A) Used improper means to acquire knowledge of the trade secret; or (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was; (i) Derived from or through a person who had utilized improper means to acquire it; (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
SAN FRANCISCO, CALIFORNIA

1278, 1288 (1990)). There can be no doubt that R&A took reasonable efforts to keep this information confidential, including (through the required Acknowledgement) requiring employees to keep R&A's trade secrets confidential as a condition of their employment with R&A, and return all firm property upon the termination of their employment.

Unless stopped immediately, the misappropriation of R&A's trade secrets is likely to interfere with valuable customer relationships and cause irreparable harm to R&A. Indeed, the evidence gathered to date shows that Defendant accessed and copied thousands of files and acted intentionally to try to hide his activities, clearly seeking to undermine R&A's relationships with its clients even before he resigned from R&A. For example, despite his use of the Eraser application to cover his tracks, the evidence reveals that Defendant accessed thousands of files in the week before he resigned, including late nights and on weekends, and that he transferred thousands of those to a folder on his PC and then to another removable drive of some sort. Among the thousands of documents that Defendant accessed and/or transferred to a folder were myriad valuable trade secret R&A documents.

Under these facts, only one reasonable conclusion can be drawn: Defendant stole R&A's trade secrets to establish a competing business. R&A is likely to prevail on its trade secret claim.

## 2. Defendant Violated The CFAA

The Ninth Circuit's recent ruling in *U.S. v. Nosal*, 642 F.3d 781 (9th Cir. 2011), recently clarified the expansive application of the Computer Fraud and Abuse Act ("CFAA") to the use of protected computer data that is either unauthorized altogether, or that exceeds authorization. To prove a claim under the Computer Fraud and Abuse Act ("CFAA"), R&A must prove that the defendant intentionally accessed a protected computer without authorization, and as a result of such conduct has intentionally, recklessly or otherwise

MEMORANDUM IN SUPPORT OF PLAINTIFF'S *EX PARTE* MOTION FOR TRO
Case No.:

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
SAN FRANCISCO, CALIFORNIA

1   caused damage. *See* 18 U.S.C. § 1030(a)(5)(A-B). Alternatively, a plaintiff can prove a claim
2   under the CFAA by demonstrating the defendant "knowingly and with intent to defraud,
3   accesses a protected computer without authorization, or exceeds authorized access, and by
4   means of such conduct furthers the intended fraud and obtains anything of value." *Id.* At §
5   1030(a)(4).

6

7           As *Nosal* clarified, under the CFAA, "an employee accesses a computer in
8   excess of his or her authorization when that access violates the employer's access
9   restrictions, which may include restrictions on the employee's use of the computer or of the
10  information contained in that computer." *Nosal*, 642 F.3d 781, 2011 WL 1585600, at *8 (9th
11  Cir. 2011). *Nosal* also held that "an individual who is authorized to use a computer for certain
12  purposes but goes beyond those limitations is considered by the CFAA as someone who has
13  'exceed [ed] authorized access.'" *Id.*

14

15          Defendant's acknowledgement that the Firm's computer data constitutes "firm
16  property" that he was not entitled to take with him when he left the Firm (Lopez Decl. ¶ 15,
17  Ex. 12) demonstrates *on its own* that he knew full well that he was not authorized to search
18  R&A's entire system, take whatever he wanted, and run.  If that were not enough, then the
19  manner in which he scanned the system in the middle of the night and on the weekend before
20  he abruptly resigned, copying files onto a removable drive in the hours before his resignation,
21  and erasing his tracks on his way out the door serves as an admission that he knew his action
22  far exceeded the authorization he was given to perform his job as an associate attorney. *See*
23  *also, Int'l Airport Ctrs., L.L.C. v. Citrin*, 440 F.3d 418, 419 (7th Cir. 2006); *ViCHIP Corp. v.*
24  *Tsu-Chang Lee*, 438 F. Supp. 2d 1087, 1100 (N.D. Cal. 2006) (deletion of computer files
25  constituted violation of CFAA); *see also Multiven, Inc. v. Cisco Sys., Inc.* 725 F. Supp. 2d 887
26  (N.D. Cal. July 20, 2010) (granting summary judgment on CFAA and California Penal Code
27  § 502 claims on the grounds that on multiple occasions and without authorization, one of the
28

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
SAN FRANCISCO, CALIFORNIA

1  plaintiffs gained unauthorized access to Cisco's computer systems and downloaded Cisco's
2  proprietary and copyrighted software).

4          In *ViCHIP*, as here, the defendant accessed the computer that was given to him
5  by his employer and deleted information. *Id.* Moreover, also as is the case here, the
6  defendant "loaded the computer with a program that would permanently delete the files so
7  that that they would be untraceable." *Id.* Likewise, as here, the defendant in *ViCHIP* deleted
8  records knowing that he was about to leave the company but while he was still an employee.
9  *Id.*

11         The evidence that R&A has already been able to gather indicates Defendant
12  used its computers repeatedly for unauthorized purposes, accessing files he had no need to
13  access in the days before his departure from R&A, making copies of files he should not have
14  been copying, and then deleting files and other evidence of his activities, all to the significant
15  damage of R&A. Indeed, R&A has incurred substantial expense as a result of Defendant's
16  unauthorized actions. *See e.g., Pacific Aerospace & Electronics, Inc. v. Taylor*, 295 F. Supp.
17  2d 1188, 1194-97 (E.D. Wash. June 20, 2003) (discussing history of the CFAA, its increasing
18  use in cases involving former employees, and the broad view of what qualifies as damage for
19  purposes of the CFAA).

21         Accordingly, R&A is likely to prevail on its CFAA claim. *See SuccessFactors,*
22  *Inc.,* 544 F. Supp. 2d at 981 (court previously granted a temporary restraining order and
23  granted plaintiff's motion for a preliminary injunction after concluding that plaintiff
24  demonstrated a likelihood that it will prevail on its claims, including CFAA claim "where the
25  offense involves unauthorized access and the use of protected information").

26  ///
27  ///
28  ///

MEMORANDUM IN SUPPORT OF PLAINTIFF'S *EX PARTE* MOTION FOR TRO
Case No.:

1

2

### 3. R&A Is Likely To Prevail On Its Breach Of Contract Claim

3    R&A is also likely to succeed on its breach of contract claim. For starters,
4 Defendant signed several documents agreeing to return R&A property upon his departure,
5 and then acknowledged in writing in April 2011 that the Firm's computer data is a form of
6 "Firm property." The evidence demonstrating that he did precisely what he agreed not to do
7 means that R&A is likely to prevail on its breach of contract claim.

8

### C. R&A Will Suffer Irreparable Harm If An Immediate TRO Is Not Granted

9

10

11    R&A will suffer irreparable harm if Defendant is allowed to continue to use
12 R&A's trade secrets to develop a competing business. R&A's trade secrets have tremendous
13 economic value to R&A that R&A derives from their secrecy, in that competitors and other
14 third parties could readily use the information to their commercial advantage. Disclosure and
15 use of R&A's trade secrets and other confidential and proprietary information would provide a
16 distinct advantage to anyone. *See, e.g., AT&T Commc'ns. of Cal. v. Pac. Bell*, No. 96-1691,
17 1996 WL 940836, at * 10 (N.D. Cal. July 3, 1996) (noting that loss of control over trade
18 secrets is its clear an irreparable harm); *Gallagher Benefit Servs. v. De La Torre*, 283 Fed.
19 Appx. 543, 546 (9th Cir. 2008) (holding that the district court did not abuse its discretion in
20 granting a preliminary injunction when the evidence supported the plaintiffs claim that trade
21 secret misappropriation occurred and that it would suffer irreparable injury) (citing *Stuhlbarg*
22 *Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841, 847 (9th Cir. Cal. 2001) (noting that
23 the "threatened loss of prospective customers or goodwill certainly supports a finding of the
24 possibility of irreparable harm").

25

26    As Defendant has already destroyed evidence, the harm to R&A is even more
27 immediate and irreparable. To the extent he has not done so already, Defendant will
28 undoubtedly make full use of R&A's trade secrets in the immediate future to obtain a

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
SAN FRANCISCO, CALIFORNIA

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
SAN FRANCISCO, CALIFORNIA

1  commercial advantage for himself.  A TRO can – and should be – issued to eliminate any

2  commercial advantage that has been or could be derived from his use of R&A's trade secrets.

3  *See* Cal. Civ. Code § 3426.2(a) (permitting even long-lasting injunctions "in order to eliminate

4  commercial advantage that otherwise would be derived from the misappropriation') (emphasis

5  added); *see also ReadyLink Healthcare,* 126 Cal. App. 4th at 1017 (recognizing that

6  "fundamental to the preservation of our free market economic system, there is 'the

7  concomitant right to have the ingenuity and industry one invests in the success of the

8  business or occupation protected from the gratuitous use of that sweat-of-the-brow' by others

9  .. ") (quoting *Morlife, Inc. v. Perry,* 56 Cal. App. 4th 1514, 1520 (1997)).

10

11  R&A respectfully requests that the Court immediately restrain Defendant from

12  further use or disclosure of R&A's proprietary, confidential and trade secret information.

13

14  **D.    The Balance Of Hardships Strongly Favors R&A**

15

16  The harm in granting a temporary restraining order that preserves the status quo

17  and prohibits Defendant from using R&A's trade secrets would be *de minimis,* if not non-

18  existent, because Defendant must simply refrain from destroying evidence and would not be

19  impeded from using information he had developed on his own. *See Lillge,* 2007 WL 2900568,

20  at *7 (granting preliminary injunction following issuance of *ex parte* temporary restraining

21  order, even where plaintiff failed to show a strong likelihood of success on the merits, as there

22  is no prejudice to defendant to be prohibited from using plaintiff's trade secrets). Further,

23  Defendant will not be harmed by an order requiring imaging of his computer files by a third

24  party vendor, as this simply preserves evidence for future examination.

25

26  In contrast, the harm to R&A will be great if the requested aid is not issued and

27  any of the electronic evidence is destroyed or deleted after service of the complaint.  R&A

28

MEMORANDUM IN SUPPORT OF PLAINTIFF'S *EX PARTE* MOTION FOR TRO
Case No.:

also will suffer significant hardship because of the theft of its trade secrets and customers. If the requested order does not issue, R&A may permanently lose its trade secrets.

3

4     **E.**     **Defendant Should Be Prohibited From Destroying Any Evidence In Electronic**
5          **Form And Required To Allow R&A's Expert To Copy All R&A Related Electronic**
         **Files In Their Possession**

6

7          As explained above, the evidence indicates that Defendant stole R&A's trade
8 secrets in the form of electronic computer files. Such files can readily be deleted or
9 destroyed. Moreover even ordinary use of these files, such as in the ongoing business
10 operations, can alter the computer files which contain R&A's trade secrets. This could result
11 in the destruction of key evidence in this case.

12

13          To prevent evidence from being destroyed, R&A further seeks a temporary
14 restraining order prohibiting Defendant from destroying, deleting, or secreting from discovery
15 any electronic computer files in his possession, custody, and control, and requiring Defendant
16 to allow an expert to copy all electronic computer files in his possession at R&A's expert's
17 residence. *See AdvantaCare Health Partners, LP v. Access IV,* No. 03-04496, 2004 WL
18 1837997. at *1 (N.D. Cal. Aug. 17, 2004) (discussing TRO previously issued by Court that
19 required defendants to produce "any and all compact disks containing information obtained
20 from [plaintiff's] computers, computer systems and/or computer network" and requiring
21 defendants "to permit [plaintiff] to make forensic copies of the hard drive and/or network
22 server for any computer used by [defendants]."); *see also Dodge, Warren & Peters Ins.*
23 *Servs., Inc. v. Riley,* 105 Cal. App. 4th 1414, 1418-22 (2003) (affirming grant of *ex parte*
24 preliminary injunction to prevent the potential destruction of evidence pending discovery
25 because (1) the plaintiff did not have an adequate remedy at law where evidence could
26 potentially be destroyed; (2) the plaintiff was likely to be able to show that defendants had
27 discoverable evidence in electronic format that had been taken from the plaintiff; and (3) the
28 plaintiff would likely suffer irreparable harm from the loss of evidence that would otherwise be

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
SAN FRANCISCO, CALIFORNIA

MEMORANDUM IN SUPPORT OF PLAINTIFF'S *EX PARTE* MOTION FOR TRO
Case No.:

1 available to it, if the injunction did not issue, whereas defendants would suffer a much lesser
2 inconvenience having to allow media in its possession to be copied, if the injunction did
3 issue); *Cargill Inc. v. Progressive Dairy Solutions, Inc.,* No. 07-407 (E.D. Cal. Mar. 2, 2007)
4 (unpublished order granting *ex parte* motion for a temporary restraining order preventing
5 destruction of evidence and requiring imaging of electronic media) (attached to Freeman Decl.
6 as Ex. A).

8 R&A similarly lacks an adequate remedy at law to stop Defendant from
9 destroying critical evidence in this case. The key evidence in this case consists of the R&A
10 trade secrets that were stolen in electronic format. Since they are in electronic format, even
11 innocent use of the files can result in spoliation of evidence. Moreover, Defendant has
12 already used software called "Eraser" in an attempt to crash all trails of computer and user
13 activity on his R&A-issued computer, and otherwise deleted extensive computer files. Given
14 this history, he may likely use similar software to delete discoverable evidence currently in his
15 possession. R&A is likely to lose information that it is entitled to through discovery if an
16 injunction does not issue now.

18 Finally, the harm to R&A of not obtaining all discoverable evidence before it is
19 destroyed is great, whereas the inconvenience to the Defendant of having to preserve this
20 evidence pending discovery is minimal.

22 Accordingly, R&A respectfully requests that the Court issue a temporary
23 restraining order prohibiting Defendant from destroying, deleting, or secreting from discovery
24 any electronic computer files in own possession, custody and control, and requiring
25 Defendant to allow an expert to copy all electronic computer files in their possession. This will
26 preserve the status quo pending the preliminary injunction hearing and further discovery in
27 this case.

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
SAN FRANCISCO, CALIFORNIA

## F.     R&A Is Entitled To Immediate Discovery Of Highly Relevant Evidence

As the theft of R&A's trade secrets is directly relevant to the granting of a preliminary injunction, R&A respectfully requests leave to take immediate – but narrowly tailored – discovery of easily destroyable evidence that is directly relevant to the injunctive relief requested.

A court may authorize discovery before the Rule 26(f) meeting when "good cause" exists, meaning that the need for discovery outweighs any possible prejudice to the party from whom discovery is sought. *Semitool, Inc. v. Tokyo Electron America, Inc.,* 208 F.R.D. 273, 276 (N.D. Cal. 2002). "Good cause" for expedited discovery has frequently been found to exist in cases involving infringement or, as here, a claim of unfair competition. *Id.* Expedited discovery is particularly appropriate in cases where physical evidence may be consumed or destroyed thereby disadvantaging one or more parties to the litigation. *Qwest Communications Int'l, Inc. v. WorldQuest Networks, Inc.,* 213 F.R.D. 418, 419 (D. Colo. 2003); *see also Pod-Ners LLC v. Northern Feed & Bean of Lucerne Ltd. Liability Co.,* 204 F.R.D. 675, 676 (D. Colo. 2002).

Here, R&A is entitled to limited expedited discovery not only because there is a substantial risk that evidence will be altered or destroyed before formal discovery begins, but also because R&A cannot know the full extent of Defendant's activities until it has a right to discover all nonpublic information that has been obtained from R&A, steps Defendant has taken to form a competing business based on that information, and the identities of current R&A clients that Defendant has solicited for information and business.  R&A requests limited expedited discovery narrowly tailored to these specific concerns. *See Semitool, Inc.,* 208 F.R.D. at 277 (allowing expedited discovery where the requests were narrowly tailored to the benefit sought and was limited to existing documents).

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
SAN FRANCISCO, CALIFORNIA

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S *EX PARTE* MOTION FOR TRO**
**Case No.:**

1

2

R&A specifically requests the following discovery from Defendant:

3

4

5

1.  A document request for Defendant requesting all nonpublic information or nonpublic compilations of public information in any form, including electronic computers files and/or e-mails, that was obtained from R&A and/or contains constitutes, refers to, reflects, concerns, or was derived from any nonpublic information, or obtained from R&A;

6

7

8

9

2.  A document request for Defendant requesting all nonpublic information or nonpublic compilations of public information in any form, including electronic computer files and/or e-mails, that relates to any business plans, goals, operations, or any other activities that concern or involve R&A's customers or employees or that concern or are based on any nonpublic information obtained from R&A;

10

3.  A document request for Defendant requesting all communications, including e-mails, sent to or from R&A's employees or clients; and

11

12

4.  The oral and videotaped deposition of Defendant at least two (2) days prior to the hearing on a motion for preliminary injunction if the preliminary injunction hearing remains set for the date provided in this order.

13          Good cause exists because R&A's need for discovery far outweighs any

14  possible prejudice to the Defendant. *See Semitool, Inc.,* 208 F.R.D. at 276. Defendant will

15  suffer little or no prejudice because R&A's requests are limited in scope to the documents that

16  are at risk of being altered or destroyed and that are directly relevant to the preliminary

17  injunction.  The requested documents are things that Defendant should not have in his

18  possession in any event.  Furthermore, the discovery that R&A requests on an expedited

19  basis is less than the discovery R&A would ordinarily be entitled to in the course of formal

20  discovery.  Thus, the burden on Defendant is less than what it would be during formal

21  discovery.

22

23  **G.    Giving Notice To Defendant Before Filing This Motion Would Defeat The**
24         **Preservation Of Evidence Held By Parties With A History of Destroying**
               **Evidence**

25

26          TROs may be granted without notice to the opposing party when irreparable and

27  immediate harm will occur before the opposing party can be heard and the applicant's

28  attorney certifies to the court the efforts, if any, which have been made to give the notice and

---

23

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S *EX PARTE* MOTION FOR TRO**

**Case No.:**

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
SAN FRANCISCO, CALIFORNIA

1  the reasons supporting the claim that notice should not be required. As discussed above,
2  R&A will suffer irreparable harm if this motion is not granted. Notifying Defendant would
3  wholly defeat the purpose of this Motion. Defendant has already deleted electronic evidence
4  to hide his activities and may do so again if he is notified of this lawsuit in advance of a court
5  order restraining them from any further destruction of evidence and requiring imaging of their
6  electronic media.

## IV. CONCLUSION

10  For all the reasons stated above, R&A respectfully requests that the Court grant
11  its *Ex Parte* Motion for a Temporary Restraining Order, Order for Expedited Discovery, and
12  Order to Show Cause:

14      1.   Enjoining Defendant from acquiring, disclosing, using, destroying or
           transferring any R&A trade secret; and

16      2.   Requiring immediate access and imaging of any computers and
           electronic storage devices in the possession, custody or control of the
           Defendant; and

18      3.   Granting R&A immediate document discovery and depositions of the
           Defendant.

20  Such an order is necessary to prevent irreparable harm to R&A and to preserve
21  critical evidence for R&A's case.

23  Dated: September 23, 2011          MILLER LAW GROUP
                                   A Professional Corporation

By: _____
       Kerry Molnerney Freeman)
       Attorneys for Plaintiff
       REEVES & ASSOCIATES, PLC

MILLER LAW GROUP
A PROFESSIONAL CORPORATION
SAN FRANCISCO, CALIFORNIA