Kerry McInerney Freeman (SBN 184764)
  kmf@millerlawgroup.com
Claudia J. Castillo (SBN 215603)
  cjc@millerlawgroup.com
MILLER LAW GROUP
A Professional Corporation
111 Sutter Street, Suite 700
San Francisco, CA 94104
Tel. (415) 464-4300
Fax (415) 464-4336

Attorneys for Plaintiff
REEVES & ASSOCIATES, PLC

FILED
2011 SE. 23 P 3: 55

SEALED BY COURT ORDER

WHA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

REEVES & ASSOCIATES, PLC,

Plaintiff(s),

v.

MATTHEW D. MULLER, AND DOES 1-25, INCLUSIVE,

Defendant(s).

Case No.: CV 11 4762

TO BE FILED UNDER SEAL WITHOUT AN ENTRY IN THE COURT'S ELECTRONIC FILING SYSTEM

DECLARATION OF ROBERT L. REEVES IN SUPPORT OF PLAINTIFF'S EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE

I, Robert L. Reeves, declare:

1. I am the Managing Partner of Reeves & Associates, a Professional Law Corporation ("R&A" or "the Firm"), an immigration law firm I founded 31 years ago. I am an attorney duly licensed to practice law in the State of California, and am also Board Certified in Immigration and Nationality Law by the California State Bar. I have personal knowledge

1

DECLARATION OF ROBERT L. REEVES IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER FOR A HEARING ON A PRELIMINARY INJUNCTION - Case No.:

2. Prior to becoming a lawyer I served three years in the U.S. Army, Infantry Division (honorably discharged) and nine years as a New York City Police Officer. I retired from the police force due to a disability I suffered in the line of duty.

3. I graduated John Jay College in New York City with honors in 1976, and from Pepperdine School of Law in 1980. I obtained my license to practice law in California in the same year.

4. R&A started with one employee and gradually grew to become a nationally known immigration law firm with four offices – Pasadena (the main office, where I am primarily based), San Francisco, Las Vegas and Manila, Philippines. R&A now has over 50 employees, including 13 attorneys, six of whom are shareholders.

5. During the past 31 years under my management, R&A has invested several million dollars developing a successful law practice. The firm secures its clients through multiple sources, including:

   a. Present and former client referrals, which account for approximately 41.8% of R&A's business;

   b. Newspaper advertising, which accounts for approximately 26.8% of R&A's business;

   c. T.V. and Radio Advertising, which accounts for approximately 10.4% of R&A's business; and

   d. The Firm's website, which accounts for approximately 12.8% of R&A's business

6. Almost half of our Firm's clients come from referrals from present and former clients, a resource that has been carefully developed by delivering quality, efficient services over the Firm's 31-year existence.

7. Additionally, we annually expend approximately $350,000 for advertising.

8. We also attract clients by publishing a weekly column which is widely read in the immigrant community, and through my participation as a speaker at educational seminars for immigration lawyers, and outreach seminars in the immigrant community.

9. We also attract clients through the well-established reputations of the Firm's experienced immigration attorneys. Indeed, R&A is one of the oldest immigration firms in California, and is nationally recognized. And the Firm's two senior partners (Nancy E. Miller and myself) have been voted Super Lawyers by our peers since 2006.

10. R&A serves immigrants throughout the United States. Most of R&A's clients are current or prospective immigrants who are starting out on or near the bottom of the economic ladder. Due to the nature of the immigration business, I have learned through my 31 years of experience that it makes more sense for the client and the Firm to enter competitively priced fixed fee retainer agreements, as opposed to hourly arrangements. Indeed, our Firm's partners invest a considerable amount of time and effort modifying our fee agreements to ensure that our prices remain competitive despite changing business circumstances. These adjustments, which are reflected in contract templates that are created by the partners and marked "CONFIDENTIAL," come as the result of market research and analysis by R&A employees – they are not the product of random formulas or guesswork.

11. To serve our clients well, and remain affordable, yet profitable, it is imperative that our attorneys efficiently perform a high volume of quality work, and perform only those services the Firm was retained to perform. To that end, there are a number of firm-created resources that have been designed to promote efficient use of our attorney resources, such as the Firm's "Brief Bank" – a collection of briefs from throughout the Firm's existence, prepared by R&A attorneys from all of the Firm's offices on various immigration topics. The Brief Bank consists of documents that are not generally part of the public domain. Most of R&A briefs and other documents contained in the Brief Bank are filed with the United States Immigration Offices, Courts and Appellate Boards. These documents are not accessible by the public. R&A's Brief Bank is an invaluable resource to R&A attorneys, allowing them to tap into the knowledge of their colleagues and the experiences of the Firm, and provide quality representation more quickly and efficiently. Likewise, the Firm has also assembled and modified various "Checklists" – a collection of forms available on governmental websites that R&A has devoted time and effort to modifying to better and more efficiently serve the specific needs of R&A's clients. These checklists are another resource that helps the Firm's attorneys and paralegals better and more efficiently serve the Firm's clients.

12. The Firm, under my direction, has also made a significant investment in purchasing immigration law treatises and continuing education resources for use by the Firm's attorneys and paralegals to stay abreast of the latest developments in immigration law. This includes purchasing materials from the annual American Immigration Lawyers Association continuing education conference. This also includes a recent purchase made for our attorneys, at the request of Matthew Muller, of an expensive multi-volume treatise regarding Defending Immigrants in the Ninth Circuit.

13. Having worked so hard for so long to build the Firm's client base and make sure the Firm's practice remains an affordable option for our immigrant client base, our Firm has gone to great lengths to protect the Firm's confidential, proprietary data, including

spending a considerable amount of money trying to establish a secure computer network, and also pursuing litigation when employees have unlawfully co-opted the Firm's valuable resources. Indeed, in 2004, the California Supreme Court upheld a lower court's ruling that two R&A attorneys who accessed R&A's computer database to print out confidential name, address, and phone number information on 2,200 clients had misappropriated R&A's confidential client list in violation of the Uniform Trade Secrets Act. *Reeves v. Hanlon*, 33 Cal.4th 1140, 1146, 1155-56 (2004).

14. R&A hired Mr. Muller on March 29, 2011. Mr. Muller represented that he graduated from law school in 2006 and passed the California Bar Exam in 2007. Mr. Muller informed us that he had only recently filed his Good Moral Character Application in order to be issued a license because he did not need a license to work at the Harvard Law School's free immigration clinic, and he saw no reason to pay bar dues unnecessarily. During the hiring process, Mr. Muller also represented that his California license to practice would be received shortly. Based on his representations, the Firm agreed to hire Mr. Muller with the expectation that his license was imminent. It is my understanding based on Mr. Muller's representation and my review of his online California State Bar records that Mr. Muller received his license on May 7, 2011. Although Mr. Muller's license took longer than anticipated to come through, the Firm paid him an attorney's salary from the date of hire.

15. Very early in Mr. Muller's career, I became aware of concerns regarding his use of the Firm's technology resources. Early on, Mr. Muller asked for permission to use his personal laptop, rather than a Firm-provided desktop, as his primary work computer. Although I initially approved Mr. Muller's request, with the understanding that his laptop would be hooked into a docking station that would be hardwired to R&A's network, I changed my mind after Shadouh Lopez who, as R&A's "Administrator II," was responsible for (among other things) all technology-related issues affecting the Firm including reviewing computer usage data, notified me of the problems posed by allowing Mr. Muller to use his

laptop as his main work computer. Primary among the concerns Ms. Lopez voiced to me was the fact that the Firm's Spectorsoft program – a program the Firm uses to monitor productivity and the use of the firm's electronic resources – was not working on Mr. Muller's computer. Ms. Lopez also raised concerns about the fact that Mr. Muller was apparently not saving his client work onto the Firm's network, which meant that that his client work was not being backed up (something that Ms. Lopez explained was vital to preserve the integrity of our computer system), and that Mr. Muller's files were not accessible to his supervisors and other staff (something that was especially critical if client data needed to be accessed when Mr. Muller was on vacation or otherwise not present in the office).

16.    I was disappointed to learn from Ms. Lopez that, despite being told to save all client work onto the Firm's shared drive, and pledging to do so, Mr. Muller was apparently neglecting to do so. I counseled Mr. Muller regarding this issue in July and August 2011, instructing him that it was imperative that all of his client-related work be saved onto the network. Indeed, I am aware of one brief that Mr. Muller prepared on his laptop but "lost" before saving it onto the network.

17.    I was also disappointed to see, upon my review of the Firm's computer usage reports, that Mr. Muller's use of apparently private internet applications, and particularly his personal Gmail account, was excessive. When I counseled Mr. Muller regarding his excessive Gmail usage in July 2011, Mr. Muller claimed that he was actually using his Gmail for professional/work-related activities. I instructed Mr. Muller that it was imperative that all work-related emails be sent on the Firm's Outlook email system, and not his personal email account, so that the emails would be secure, accessible to the Firm (in effect part of the Firm's files), and backed up to preserve the integrity of the communications. I also asked Ms. Lopez to check to see if Mr. Muller was, in fact, using his Gmail for work purposes. Ms. Lopez informed me that after reviewing a handful of screenshots she found two partial Gmail messages that she (and I) found quite troubling:

a. The first screenshot depicted a partial email dated June 22, 2011 at 11:12 a.m. and drafted by Mr. Muller. In that e-mail, Mr. Muller wrote the following to one of his contacts: "I'm an associate at a for-profit firm now, but it's basically only until I learn the business model and management well enough to launch my own firm that will be a sort of private practice/impact litigation/legal services hybrid."

b. The second screenshot depicted a partial email dated June 26, 2011 at 6:37 p.m. and drafted by Mr. Muller. In that e-mail, Mr. Muller wrote the following: "I'm working at a small firm (well, pretty largish as immigration firms go, but we're a satellite office), **mostly I'm just learning the industry before I start my own firm (or might co-opt this one, haven't decided)**.

18. On Wednesday September 14, 2011, while I was headed home from a trip to San Francisco to attend a meeting, I was disturbed to learn from Ms. Lopez that starting the prior Saturday, September 10, 2011, Mr. Muller had been accessing an enormous amount of computer files that Mr. Muller had no business accessing and copying a large volume of those files – including files containing private, confidential, attorney-client-privileged, and proprietary information and trade secrets – onto external, non-firm drives. I understood from Ms. Lopez that many of the files Mr. Muller accessed were difficult for the ordinary user to access, and that it took a lot of time and effort for him to track down and copy those files.

19. I was so disturbed by what I considered to be a breach of private, confidential, proprietary, and privileged information, that the same day, within an hour of learning about the breach, I ordered that the entire San Francisco office's connection to the Firm servers housed in Pasadena be shut down to prevent any further compromising of the Firm's privileged, proprietary and trade secret information.

20. Although we planned to question Mr. Muller regarding his actions on September 15, as soon as one of my partners, Ms. Miller, was available to speak with him, we did not get that opportunity because Mr. Muller emailed me and others at 5:30 a.m. the following morning, September 15, to announce his resignation, effective immediately. It is my understanding, based on what we learned from the building's security personnel, that Mr. Muller returned to the office an hour or two later, hastily packed up his things, walked back to his car and drove off.

21. Mr. Muller left the firm without providing any information about the status of his cases.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct and was executed on September 22, 2011, in Pasadena, California.

Robert L. Reeves

4836-1680-8714, v. 2